WILLIAM R. KING, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
King v. Commissioner
Docket No. 22601-89
United States Tax Court
T.C. Memo 1993-237; 1993 Tax Ct. Memo LEXIS 240; 65 T.C.M. (CCH) 2811; May 26, 1993, Filed *240 Decision will be entered for respondent. William R. King, Jr., pro se. For respondent: Brenda M. Fitzgerald. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Year
Additions to Tax
Ended
Deficiency
Sec. 6651
Sec. 6653(a)(1)
Sec. 6654
Sec. 6661
1986
$ 14,052
$   703
$ 1,202
$   939
$ 3,513
1987
25,564
2,556
1,604
1,628
6,391
The issues for decision are: (1) Whether petitioner's horse-breeding activity was an "activity not engaged in for profit" within the meaning of section 183(a). We hold that it was "not engaged in for profit". (2) Whether petitioner is liable for additions to tax under sections 6651, 6653(a)(1), 6654, and 6661. We hold that he is. All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. At the time of the filing of the petition, petitioner was a resident of Corbett, Oregon. *241 Petitioner is a chiropractor who operates his own clinic. During the years at issue, petitioner's clinic was open from 9:00 a.m. to 7:00 p.m. on Mondays, Wednesdays, and Fridays, and from 9:00 a.m. to 5:00 p.m. on Tuesdays, Thursdays, and some Saturdays. During the first couple of years of operating the clinic, petitioner lost money. However, during the years at issue, petitioner's clinic was very profitable. Petitioner attended seminars to learn how to improve his chiropractic business and made an effort to improve his image to increase his business. Prior to 1983, petitioner owned various unregistered horses for personal use. In 1983, petitioner and his wife decided to begin breeding Arabian horses. In making his decision to begin his horse-breeding operation, petitioner read Arabian horse journals and consulted breeders and trainers to gauge the market and learn about horse breeding. Petitioner's original plan was for his wife to do most of the work on the horse farm to save on labor costs. However, petitioner and his wife were divorced shortly after beginning the horse-breeding operation, so petitioner hired trainers and other employees to do the work his wife would *242 have done. In addition, petitioner worked at the horse ranch daily, feeding, brushing, worming, and, on occasion, exercising the horses. Petitioner continued to read relevant literature regarding marketing and caring for Arabians, including articles on veterinary medicine. Petitioner also hired trainers, consulted experts, and advertised his breeding activity in the Arabian horse journals. Petitioner registered with the State Corporation Commission as doing business as "All the King's Horses", and he filed the appropriate employment tax forms. He established a separate checking account for his horse-breeding operation, but many of the receipts substantiating expenses paid from that account were missing. Petitioner employed a bookkeeper, who performed work for both the chiropractic clinic and the horse breeding operation, but the extent of petitioner's recordkeeping is unclear. He had no written records for the purpose of determining cost allocation or cost reduction. In addition, other than petitioner's tax returns, the only documents before us providing information regarding petitioner's income from his horse operation are two charts which set forth inconsistent information *243 about petitioner's purchases and sales of horses. Petitioner expressed an intent to become the best Arabian breeder in Oregon and testified that he anticipated his horse-breeding operation to be successful over the long term. However, petitioner did not perform any marketing studies prior to entering the horse-breeding business, and he did not have a specific business plan. Each time he purchased horses, petitioner "penciled out" the expenses, but he did not make formal expense projections, and he did not figure startup costs, such as building his barn, into the equation when determining the profitability of each horse. Petitioner purchased his first horse for his horse-breeding operation in 1983 for $ 5,000. The horse was a 3-year old mare named Mi Kalila. Petitioner intended to breed the horse and sell her foals for $ 4,000 to $ 6,000. However, he was unable to breed her until 1985, and her first foal had crooked legs and could not be sold. Petitioner gave away Mi Kalila in 1987 on the advice of his trainer. In 1985, petitioner made a block purchase of six mares for $ 20,000. Petitioner was advised by Paul and Kit Dixon, who owned a horse farm, as well as working other *244 jobs, that one of the horses, S.F. Katia, alone, was worth the purchase price and the others would just be a bonus. He did not have the horses evaluated by Joanne Newland, one of his trainers, until after the purchase. Some of the mares did not grow to full potential, and most of them did not produce large enough foals, so petitioner was unable to produce enough income from the mares to cover his expenses. Moreover, under the purchase contract, petitioner could not sell any of the mares until all payments under the contract were completed. Also in 1985, petitioner purchased a stallion named Shakhanti Sudan for $ 3,500, and in 1986, he purchased another stallion, Proletariat, for $ 21,000. In both instances, temperament was one of the factors petitioner considered in making the purchase; however, he also considered other factors, such as the horse's beauty and breeding. Proletariat was number 38 on the list of national show horse sires, and his stud fee was $ 2,000; however, petitioner only bred him twice for fees in 1987. Petitioner estimated $ 650 per month in expenses in connection with owning Proletariat; he anticipated breaking even on Proletariat in his second or third *245 year of breeding him. Petitioner also purchased a gelding named Kalabasko in 1986 for $ 6,200. He was advised to purchase Kalabasko by his trainer, who told him that he could sell the horse for $ 10,000 to $ 12,000, if he were willing to wait for the right buyer. He sold Kalabasko in 1989 for $ 4,500. In 1987, petitioner purchased two saddlebred mares, which he intended to breed with Proletariat to produce national show horses. He expected the foals to sell for $ 5,000 to $ 10,000. He sold one of the mares for $ 6,000 in 1990 and still owned the other at the time of trial. When petitioner began his horse-breeding operation, the top Arabian mares were selling for about $ 1.5 million. Petitioner did not expect to sell his horses for that amount; however, his original intent was to sell them for about $ 200,000. Beginning in 1986, breeding of Arabian horses began to decline along with the value of the horses. At the time of trial, top Arabian mares were selling for $ 20,000 to $ 40,000, and the lesser horses were selling for $ 500 to $ 5,000. Petitioner had difficulty selling his horses, and as a result, he ended up owning 23 horses at one time. At one point, one of petitioner's *246 trainers suggested that petitioner might have better luck selling his horses in Arizona or California. However, petitioner did not take that advice because it would be expensive to transport and board the horses, and there was no guarantee that the horses would sell. In order to reduce expenses, petitioner was eventually forced to sell off most of his horses at significantly reduced prices. By reducing the number of horses he owned, petitioner cut back the expenses and made a small profit in 1990. OPINION The issue we must decide is whether petitioner's Arabian horse-breeding activity constituted an activity "not engaged in for profit" pursuant to section 183. Section 183(a) provides that if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as otherwise provided in that section. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable * * * under section 162 or under paragraph (1) or (2) of section 212." In order to show that an activity was engaged in for profit under section 183, petitioner must establish that he had an actual and *247 honest objective of making an economic profit independent of tax considerations. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Petitioner's expectation of profit need not have been reasonable; however, petitioner must have entered into the activity, or continued it, with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., lists the following objective factors to be considered in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity (i.e., whether the activity is carried on in a businesslike manner); (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity will appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's *248 history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. These objective factors are to be given greater weight than petitioner's mere statement of his intent. No single factor is controlling; the issue must be resolved based on all of the facts and circumstances. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Respondent contends that petitioner did not operate his horse-breeding operation for profit. We agree. First, we consider whether petitioner operated his horse-breeding activity in a businesslike manner. While it is true that petitioner registered his business and filed the appropriate employment tax returns, it is clear that petitioner did not have an organized system for determining the profitability of each horse. In addition, although petitioner promoted his horse-breeding operation through advertising and showing his horses, such promotion was not successful, and petitioner did not change his methods to attempt to improve his success rate. Most importantly, petitioner failed *249 to keep adequate records. We were not presented with any income records, the only expense records offered in evidence were canceled checks, and petitioner did not even have sufficient records to provide consistent information regarding the purchase and sale of his horses. Petitioner did attempt to educate himself about breeding Arabians and consulted advisers with various levels of expertise in that field. However, it is clear that petitioner did not acquire sufficient expertise or receive adequate advice to prevent him from making poor decisions, such as the block purchase of six mares, five of which were merely a drain on petitioner's resources. It is unclear how much time petitioner personally spent at his horse-breeding activity. He performed some work at the horse farm daily. However, he also spent significant time operating his chiropractic clinic, and much of the work on the horse farm was performed by hired hands. Petitioner apparently anticipated that his assets would experience some appreciation. He expected his horses to produce quality offspring that would increase the value of his herd. However, some bad luck and poor decisions left petitioner with a large herd *250 that he had difficulty selling. Petitioner had been successful in operating his chiropractic clinic. After suffering losses during the early years of operation, he turned his clinic into a successful operation, and even opened a new clinic in 1989. However, petitioner had never operated any business similar to his horse-breeding activity, and we are not convinced that the skills needed to run a successful chiropractic clinic carry over to operating a horse farm. Moreover, petitioner did not concentrate on his horse-breeding operation to the same extent that he concentrated on his chiropractic clinic because he "had to go with * * * the one that was making [him] money." From beginning operations in 1983 until 1990, petitioner sustained losses totaling $ 388,106 from his horse-breeding activity. Such a history of losses is an indication that an activity was not engaged in for profit. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Moreover, while it is true that presence of losses during the early stages of an activity is not inconsistent with a profit motive, "the goal must be to *251 realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." Id. We do not believe that petitioner looked at his horse-breeding activity in such a comprehensive manner. Petitioner testified that he did not project startup costs into the cost of operation. He stated: "All I know is that it costs so much to start, and then you get there and start working." Such an attitude is inconsistent with an intent to make a profit from his horse-breeding activity. Moreover, petitioner had the financial ability to withstand continued losses in his horse-breeding operation. From 1983 through 1989, petitioner made a total profit of $ 570,212 from his chiropractic clinic. Such profits were enough to absorb petitioner's losses from his horse breeding activity. However, such losses were real in that they produced some financial strain which would have forced petitioner to consider discontinuing his horse-breeding activity after 7 years of substantial losses, if he had an actual and honest objective of making an economic profit. Finally, it is clear *252 that petitioner received some enjoyment from his horse-breeding operation. We recognize that caring for horses and maintaining a horse farm is hard work. However, it is unclear how much of the work petitioner performed personally. Moreover, the fact that running the horse farm was hard work does not negate the pleasure petitioner received from owning the horses. Taking all of the objective factors into account, we conclude that petitioner did not have an actual and honest profit objective. Based upon the facts before us, we hold that petitioner's horse-breeding activity was not engaged in for profit within the meaning of section 183. Therefore, petitioner is not entitled to any deductions in connection with that activity. Petitioner relies heavily on Burrow v. Commissioner, T.C. Memo. 1990-621, arguing that his case is almost identical to that case. However, we find that the facts in the two cases are quite different in many respects, and petitioner cannot take comfort in Burrow. We note that the determination in these cases is a factual one, and the facts before us do not favor petitioner. Respondent determined that petitioner is liable *253 for additions to tax under sections 6651, 6653(a)(1), 6654, and 6661. Petitioner bears the burden of proof on this issue. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioner presented no evidence regarding the additions to tax; therefore, he failed to meet his burden of proof. We hold that petitioner is liable for the additions to tax as determined by respondent. Decision will be entered for respondent.